I represent the appellants in this case, and after witnessing some very well-argued career case, I'm glad to present to the Court a light and fresh erysomen. I don't want to hear erysomen. I'm going to go right to the point in this case. There's a lot been briefed both sides, but let's just go right to the chase, and that is, as a matter of fundamental fairness, equity, a matter of trust law, contract law, disqualifying terms must be disclosed. How could it be otherwise? It doesn't matter whether this is an ERISA case or a contract case. It doesn't matter because you can't have secret terms. In this case, the appellants were long-term employees. They were salesmen for Western & Southern. They sold basically life insurance and those types of products, and they were told repeatedly over the years, you improve your quality and you get your production up. We're going to give you conferred income, so when you retire, you have a bonus. Not once did they ever hear or receive a copy of a plan. They didn't hear of any disqualifying terms, and then when they do retire after 30-something years of service, they receive an award letter saying you're going to get these benefits. Thank you very much. You're going to be getting these payments on this type of order, and then shortly thereafter, they're met with a lawsuit saying, whoa, whoa, whoa, whoa, you went and registered with another company that breached the terms of the plan. We want the money back. Whether it's a top-hit plan, a top-hit plan is an ERISA plan. The case started in Ohio with a suit by Western & Southern against Mr. Owens in Ohio. He had only been to Ohio to receive awards, annual conferences at the company headquarters, but anyway, he's sued there on a motion to dismiss. The trial court says that's an ERISA case. We don't have jurisdiction. He goes to the appellate court. Somehow, instead of just saying that's an ERISA case, they say it's a top-hit ERISA case. Exclusive jurisdiction, federal courts, motion to confirm. Case dismissed, judgment affirmed. It comes here, and we argue from the beginning that this was not a top-hit plan, but even if it was, still, you have a duty to disclose disqualifying terms. You may not have a duty to give them the terms of the plan, but you've got to tell them, hey, you're going to get these benefits, but don't do A, B, and C, or you're going to lose them. It was not correct. It was clear error for the court at the last minute to decide that the judicial estoppel doctrine should be applied in this case. One, because in dicta in the appellate court in Ohio, it said top-hat ERISA plan, and in connection with a motion, a discovery motion, before the federal district court, where I had sought the plan, because we didn't have it, and we asked for it, and Western said it, Southern says, no, we're not giving it to you. You can't have it. I had to file a motion to compel to get it, and inadvertently, in there, I do say top-hat ERISA. Those are the only two instances where you see the plaintiff having something to do with saying it was a top-hat plan. We never argued that it was, and we never benefited from the fact. We benefited from the fact it was an ERISA plan. That gave the federal court exclusive jurisdiction, and that was the only. So the test for judicial estoppel is not even close to being met. We didn't argue inconsistent positions. We didn't argue for the court to find it was a top-hat plan, and we didn't somehow take advantage of it, because the whole idea was it was an ERISA plan. Now, if it's not a top-hat plan, the fact that they failed to give the plan documents, disclosures, to the participants, automatically entitles us to benefits, end of story. But even if it is a top-hat plan, and there was no evidence that there was, there was no evidence in the administrative record, and as we know from Lane, the court can only review evidence that's in the administrative record. There was nothing in the administrative record. We had told the administrator we didn't believe it was a top-hat plan. It was their duty, the burden of the defendant, to establish that it was a top-hat plan. They presented no evidence to the plan administrator. The committee made no finding that it was a top-hat plan. So there's nothing in the record to show that it is a top-hat plan. Now, top-hat plans are, you know, they're tough to find because it has to be a special plan for top-level, all salesmen, all insurance. But it's top 5%, right? It's limited to 5%? Top-hat 5% of the insurance salesmen, who have nothing to do with their terms of employment or compensation. They're not involved. They're not at the, they don't go to meetings. They don't see it. They knew nothing about this other than what they were told annually is if you get in that top 5%, we're going to give you certain deferred compensation depending on your production and your profitability. That's all they were ever told. There's no evidence to the contrary whatsoever. So these men had no knowledge. And there's no evidence at this, there's nothing in the record at this point about how these salesmen's salaries compared to the rest of the company? Nothing. Mr. What's the standard for them being? Well, the evidence in the record was the affidavits and statements of deposition that were taken during the litigation, not in the administrative process, remember, but we did put virtually all of that evidence into the administrative record when we were remanded. Initially, we argued that there was no reason for administrative review because that'd foul suit. It was going to be, they'd already made their decision. They'd foul sued against them. Why do we have to go to administrative review? But the court ruled administrative review was mandatory. We went back. We put all the evidence that had been presented before, put it into the administrative record. We argued it wasn't a top hat plan. And they waited to the max amount of time and said, look, these guys, they got licenses with other insurers and therefore they violated the terms of the plan. Made no examination, there was no evidence and no finding that they actually engaged in competition, which was a term of the plan. Not that my guys ever knew the terms of the plan, but in the plan it says you've got to be in competition with the company. And we argued that just being licensed isn't enough. And in one case, Mr. Owens testified, who had been a manager here, insurance manager of other agents for many years. And when he retired, other agents came to him and said, we've got some Western Southern customers who need some more insurance, but Western Southern doesn't sell it to them. Will you help us? So he goes and gets licensed with somebody else and he sells them some policies that because of their age and health, they couldn't get with Western Southern. How did your clients know they were getting entitled to this money if they never got the plan summary? Because there were letters to the employees saying, you know, we have this program and if you're up in the top 5%, you're going to get so many credits for your volume over your line and you will accumulate that. And then when you retire, you're entitled to get it and you have some options of whether you want to lump some or you want to take it over time and those type of things. But not once did they ever give them a disclosure of the disqualifying terms. That's the key here. This whole case comes down to this. If you don't know what you're not supposed to do, then how can you not do it? How is it fair to say, go work for me, do extra job, go over and above, be a special agent for us, and we're going to reward you? That's a unilateral contract. And they did it. And they retire and they get an award letter saying, thank you very much for all your service and you did this and you've qualified for the special payments and you're going to get X dollars every quarter for so many times. Okay? Nothing about it. Now, be sure not to go and get licensed with another company. Be sure don't go in competition with us. Be sure not to do these other things. Nothing, no hint that there were any qualifying terms. Any. There was no way to say, look, but be careful, we may take this back. That's not fair. That's just fundamentally fair. And, you know, the court, the Ninth Circuit, and Bins v. Exxon and, of course, in the Enron Corporation Security case, planned to have a duty to provide information that's material to the beneficiary. If you're going to give them any information, you've got to know that it's accurate, it's truthful, and you can't omit something that's material. And what can be more material than disqualifying terms? So even if this is a top-hat plan, I still had a duty to talk about the importance of the fact that even in top-hat plans, disclosure requirements, they're not exempt from disclosure requirements. And so we don't believe there's no administrative evidence to support a finding that this is a top-hat plan. Judicial estoppel clearly doesn't apply because not one of the three points to establish a judicial estoppel is in the record, exists, and the only two references were clearly inadvertent and really should not have been considered by the court. So I'm going to yield the rest of my time, unless I have additional questions, because I think the case is really straightforward and simple. Disqualifying terms must be disclosed. Thank you. Thank you, sir. Mr. Blickensterfer? Good morning, Your Honors. May it please the Court, I'm Matt Blickensterfer on behalf of the Western Southern Life Insurance Company and the plan at issue here. I'd like to begin, Your Honors, with two clarifying points on issues that came up during opposing counsel's argument. First of all, the plan is not limited to salespeople. The plan is So in response to your question, Judge. 5 percent defined as the highest earning 5 percent, or what 5 percent? The top 5 percent of earners by compensation, Your Honor. So there is that evidence in the records. Including executive officers and management? Yes. Yes, Judge Dennis. There were separate top-hat plans maintained by the companies for employees and for agents, independent agents of the company. But the plain language of the plan at issue here that applied to employees was for employees across the board. And to the best of my recollection, there is no exclusion for the executives of the company. Just by way of example, Mr. Owens here, Mr. Espat, I'll start with him. He was earning something close to six figures. Mr. Owens at some point was earning $230,000 a year as the manager of a region for the company. The second thing I'd like to clarify is that Mr. Williford cited the Benz case, B-I-N-S, out of the Ninth Circuit for the proposition that there was a fiduciary duty here to affirmatively disclose something. The Benz case, on which he relies in his appellate brief and presumably here in oral argument, was vacated by the en banc court. And the en banc court of the Ninth Circuit came to a different conclusion on this very point than the panel had. So a case is not good law, and it doesn't even involve a top-hat plan as well. Your Honors, the two primary issues in this case, the plan administrator's merits determination and the district court's judicial estoppel determination, are both reviewed under the most forgiving standard of appellate review, abuse of discretion. And this is true even though the posture of this case is summary judgment. Case law from this case makes it clear that judicial estoppel is reviewed for abuse of discretion, even if it is the basis on which summary judgment is granted, or another dispositive motion. That case is Kane v. National Union. Judge King, you were on that panel. There's a follow-up case called Love Against Tyson Foods that you wrote, Judge King, that was a motion to dismiss in that case. But nonetheless, it makes clear that a dispositive motion still gets reviewed for an abuse of discretion if the basis is judicial estoppel. The plan administrator's merits determination here was clearly reasonable, certainly not an abuse of discretion. I won't belabor that point unless there are questions from Your Honors this morning, because Mr. Williford didn't have anything to say about the merits determination. But the employees were clearly competing with the company during the forfeiture time period, and that was also cause for them to be terminated, had they still been employees of the company. The plaintiff's own testimony, you know, makes both of those points on the merits of the determination clear. Were they warned? Were they put on notice? They were not warned, Your Honor. You know, it is, there is, there is, I'll put it this way. They're, they claim they never received any notice of the forfeiture provisions or the plan. There is an affidavit in the district court record, albeit not the administrative record, that indicates that the company's practice, even for summary plan descriptions, to the participants. We contend because it's a top-hat plan, and they're judicially stopped from contending otherwise, that that issue is irrelevant because top-hat plans are fundamentally different than normal ERISA plans where summary plan descriptions are the norm and required. That is a policy choice that was made here by Congress for employees of a certain type, and it was a policy choice that was implemented by the Department of Labor. There is not any constitutional challenge in this case to the statutory provisions or any Administrative Procedures Act or other constitutional challenge to the Department of Labor regulations on this point. Wait a minute. Now, let's back up. He is arguing here, anyway, that they never were given any notice that they could give up this money if they went to work doing what they did, whatever it was. Now, you say that that's, let's assume that's true, that it's irrelevant. Why? Because for top-hat plans, Your Honor, Congress has made the determination that the usual rules relating to disclosure, vesting, fiduciary status, so on and so forth, do not apply. Those usual ERISA rules do not apply to top-hat plans. And, you know, we could debate the merits of that policy decision by Congress, but that's the decision that has been made. So your response to that, and I'm not faulting you. I just want to be sure I understand it. Your response to this is, even if he didn't get word won about this forfeiture condition, we had no obligation to tell him that. That's correct, Your Honor. We don't necessarily agree that they didn't get notice of this because, as I indicated, there's affidavit in the record from the human resources person that is at the company's practice to provide summaries of the plan, even for top-hat plan participants. But that is correct, Your Honor. Congress and the Department of Labor, in the case of top-hat plans, have not, have chosen not to impose that duty on the employer as it is imposed in the usual ERISA case. Instead, the affirmative duty to seek out information about the plan rests with the plan participants. Can you give me a citation to the statute that provides that? I can give you a citation to the regulation, Judge Dennis, and I may be able to give you the citation. Well, if it's any brief, that's fine. I just... The regulation is, and I'll get you the statute here in a moment, the regulation is 29 CFR 2520.104-23. And then the statute, Your Honor... The starting point in the statutory scheme, Your Honor, is 29 U.S.C. 1101A1. And that is the provision that exempts top-hat plans from a variety of ERISA, typical ERISA requirements for non-top-hat plans. Thank you. Thank you, sir. So if this is not an ERISA plan, is what you're saying, this just isn't governed by ERISA? It is governed by ERISA, but it's a type of ERISA plan, Judge King, that it has been exempted from many, not all, but many of the normal ERISA requirements. And what's the rationale that management and top earners are more sophisticated? That's right, Judge Costa. The rationale is that certain types of employees are able to fend for themselves and do not need the kinds of mandatory disclosures and other provisions that are coming from that arise out of a typical ERISA plan for the run-of-the-line employees. And if I can quote the... I don't suppose it's so simple that the regulations say that the upper 5 percent of earners in a company are exempt from certain regulations. It's not quite that straightforward, Judge Dennis. The top-hat plan is defined in the statute as a plan for a select group of managerial or highly compensated employees and which is not funded. And funded in ERISA parlance is kind of a term of art that would indicate a separate res or trust into which assets are placed and there's vesting associated with that. These top-hat plans are used for upper-level employees and they're oftentimes incentive bonus deferred compensation type plans and they're not funded. The thing that just strikes me as odd about all this, and maybe it's irrelevant because it really hasn't been pursued, we're all talking about ERISA, okay, is it or isn't it? Well, just as a matter of ordinary contract law, never mind ERISA, leave it out of the picture. If you have people who are the beneficiaries of one of these plans, don't you have some say, okay, here, as we say on the Mississippi River, here are the rules of engagement. Just never mind ERISA, leave them out of it. Just as a matter of contract law, this person's been working for you for X number of years. He's got this entitlement to some money every quarter or whatever it is. Don't you have to say here's the deal? Respectfully, Judge King, no, under the statutory and regulatory. I understand that's true under the statute. Yeah. Just as a matter of ordinary Louisiana law, is this Louisiana? I'm sort of lost. Yes. It's a New Orleans case. Just as an ordinary Louisiana law, don't you have an obligation to tell somebody who's a beneficiary of something like this, here's the deal, so if you go out and you sign up with some other company, we just stop paying. You don't get any more money. No, Your Honor, because any right to relief, any claim that the plaintiffs would have here arises from ERISA because it is an ERISA plan. There is no doubt about that. It's just a special type. So that completely preempts ordinary Louisiana, whatever we call it here. It isn't common law, whatever. I don't believe the plaintiffs have any claim based on State law here, Your Honor, and they have not made any. I'm gathering that, too. Yeah. I understand and appreciate where a lot of these questions are coming from. This is a different regime from what I think all of — I'm not an ERISA lawyer. I'm an appellate lawyer, but I've done ERISA appeals, and this is a different regime than the normal ERISA plan. And, you know, we can debate the wisdom of why Congress and the Department of Labor have gone down this path, but this is the path they went down, and so there was no duty to disclose anything here. The disclosure obligation was completely fulfilled by meeting the standards set forth in the regulation, which was to notify the department of certain factual information about the plan and to provide information to the department upon request. And the department, of course— Going back to the question of whether this is a top hat plan, which is in this world that may not require the disclosures, do you need to show a comparison of these top five earners versus what other people in the company were earning? We don't have a lot of case law on what makes a top hat plan, but I think it's Alexander out of the First Circuit talks about there needed to be a showing that the money these people were making — you know, if they were all making a million bucks and everyone else was making $30,000, sure, it's a select group. But if the disparity is not that great, the First Circuit indicated it might not be top hat. So what showing is actually needed? You're absolutely right, Judge Costa, that there's a bit of a dearth of case law nationwide on what showing is needed. This court, in the reliable home cases that we cited, looked to the terms of the plan itself to make the assessment of the plan's top hat status. And because this plan indicates that it is limited to the top 5% of employees, I think that inherently answers the question about high earners. You know, there is a case, the name of which I'm blanking on, I apologize, but there's a case out of the Second Circuit that faced this question, and they had 15.4% of employees who qualified under this top hat plan. And they found that that was — they found that perhaps that was near the outer boundary, but that was good enough. And so I would say, by definition, because this plan, under its terms, limits it to 5% of — the top 5% of earners in the company, employees, or earners in the company, that that test is satisfied from the face of the plan itself. And as for the — I'm not sure about that. Beg your pardon, Judge? I'm not sure about that. About the employees? Yes, that it's limited to the 5%. Yeah. Of the earners, regardless of whether they're officers, salesmen, or whatever. Yeah. As sure as I can be standing here before you, Your Honor, I am, because I looked at the plan language again last night, and I did make a mental note that this is — this says employees. It does not say sales staff or sales employees or anything like that. So I'm — just because of human fallibility, I'm reluctant to tell you I am 100% sure, but I'm as close to it as I can be as I stand before you. So the other criterion for the Top Hat plan, you know, to follow up on your line of inquiry, Judge Costa, is whether it's funded or not. And the plan itself, I think, answers that question as well. It makes clear that people, they're creating some sort of bookkeeping account on the books of the company to reflect, you know, the credits that employees under this plan would qualify for. So there's absolutely nothing in the plan or anywhere else in the record that indicates this is a trust that was set up or a separate res or anything else that would indicate that the plan was funded. It's an accrual is what it is. It's a bookkeeping entry as far as I can tell, Judge King. That's right. Yeah. Yeah. In addition to, you know, the issue of, you know, whether on the merits the plan is in fact a Top Hat plan, you know, this judicial estoppel point, I would submit, was absolutely decided correctly by the trial judge here. Repeated statements by the plaintiffs in this case that it was a Top Hat plan. And during the pendency of the federal case in the district court, the Ohio Court of Appeals rendered its decision indicating that the parties, which in that case was Mr. Owens and Western and Southern, agreed that it was a Top Hat plan. That was not dicta because Western and Southern's argument in that case was that its claims for a clawback of the money were not preempted because it was a Top Hat plan. And the Court of Appeals in Ohio decided that, notwithstanding the fact that it was a Top Hat plan because the parties so agreed according to the Court of Appeals, the claims were nonetheless preempted. The district judge here, subsequent to that Ohio Court of Appeals decision, remanded to the plan administrator for exhaustion of administrative remedies on the express premise that the parties agreed it was a Top Hat plan. And yet the plaintiffs did not challenge that in their appeal to the plan administrator. They did not challenge that in the appeal to the plan administrator even after the plan administrator said it was a Top Hat plan for the following X, Y, and Z reasons. And the plaintiffs moved the plan administrator to reconsider. They still didn't challenge that it was a Top Hat plan. It wasn't until the case came back from the plan administrator after a couple of years of litigation under which the case had proceeded on an agreed premise that this was a Top Hat plan and after Western and Southern moved for summary judgment because it was a Top Hat plan, among other reasons, that the plaintiffs finally said something to the effect that it was not a Top Hat plan and started making that argument. The district court correctly believed that she had been adjudicating the case all along and had been led to believe that it was in fact a Top Hat plan and she had correctly applied judicial estoppel in this case, Your Honors. Any further questions, Your Honors? I guess not. Thank you, sir. Thank you very much. Mr. Winifred. I disagree. Counsel was incorrect on the facts there. And there were only two instances where the term Top Hat plan, Top Hat ERISA plan were used by plaintiffs. It was in both cases, but I've explained it to you before. It was not something that was repeated. When the judge remanded the case to the administrative record, she made it a finding that this was an ERISA case that demanded administrative process, and that's why it was remanded, not because it was a Top Hat plan that demanded administrative process. No, because it was an ERISA plan that demanded administrative process. In the notice of administrative review, we set forth this is not a Top Hat plan. And even if it is, there's no record evidence of this stuff. They had the duty, the defendants had the duty to prove that it was a Top Hat plan. They put no evidence in the administrative record. There is no evidence in the trial court record, which should be only based on the administrative record, supporting the facts that this is a Top Hat plan. And a Top Hat plan is unfunded and maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. That's reliable home. Reliable home tells us, instructs us on what is a Top Hat plan and what is not. But when you have no evidence to base it, you can't now relitigate whether they supported it. The only reason that they argue it's a Top Hat plan is because the judge imposed judicial estoppel, which just doesn't apply. And there were apparently no repeated statements. And I think it's important, if we get into the Fifth Circuit in Reliable Home, 2002 decision, never been reversed. It's been cited millions of times, that even a Top Hat plan is not exempt from fair review and reporting, administration, enforcement, and disclosure. Of course, disclosure. Now, the cases that said disclosure doesn't necessarily mean you've got to give the provisions of the plan, which ERISA says normally you have to give. But it does say disclosure is important. 29 U.S.C. 1022B. Let's get into ERISA. It's not an easy read. Expressly requires disclosure of circumstances which may result in disqualification, ineligibility, denial, or loss of benefits. That's almost verbatim from the statute. What could be more important? Why would you even have to put it in the statute? If you're going to impose a contract on someone and you have some secret terms, well, you know, you can't enforce that. There's a lack of consent there. You have to have the terms disclosed. The Department of Labor, and this is a letter by the Department of Labor, it's an opinion letter cited in the brief in 9014A, 1990 opinion, in which the Department of Labor said, Congress recognizes certain individuals by virtue of their position or compensation level have the ability to affect or substantially influence through negotiation or otherwise the design and operation of their deferred compensation plan, taking into consideration any risks which would need substantial rights and protections. Congress found that in certain cases, top management, the officers of the company, the guys who run the company every day, they have power among themselves. You don't have to be as strict in your disclosure requirements as a normal ERISA plan. When you have 100 to 200, they call them field associates. That's how it's defined in the Western Southern plan. Field associates who are insurance salesmen all over the country have no participation in management at the top level. There is no requirement, just cost, that they make so much money or more. It's just how much among all the insurance agents to qualify for those benefits. But what about he says it's 5 percent of all employees. I guess we just have to look at the plan first. Field associates. The plan is a part of the record only because I had to get a court order compelling production of it into the record. If you're going to make disclosures, you should disclose disqualifying plans. You should disclose the plan itself. But even when you file a lawsuit and you don't want to produce it, you have to compel it, that shows the great length that Western Southern went to hide these terms so that they could go and got you and not have to pay the money after the employees have retired and no longer of use to the company. Thank you. Thank you, sir.